0UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

      Plaintiff,

v.                                                           Case Number: 22-20040-03-HLT

RONALD QUINN,

      Defendant.

## MEMORANDUM & ORDER

This matter comes before the court on defendant Ronald Quinn's Motion for Release Pending Trial. (ECF 120.) After Quinn was arrested in this case, the initial Pretrial Services Report recommended that he be released on bond. But much has changed since then. After the court released him on bond supervision in September of 2022, he immediately began violating his bond conditions and lying to his supervising officer at his initial intake appointment just two weeks later. His violation conduct continued and escalated, leading the court to revoke his bond on January 5, 2023. After several false starts towards inpatient treatment (explained below), the court eventually released him to attend inpatient treatment, after which the court approved him to live at an Oxford House. But just 10 days after he moved into the Oxford House, he got kicked out and the court once again revoked his bond. (ECF 147.) Now, Quinn once again seeks release to return to live at the Oxford House. (ECF 161.) The government opposes release. (ECF 162.) The court has also consulted with Pretrial Services, which recommends that Quinn remain detained for the reasons stated in Exhibit A, attached hereto. As explained below, Quinn's motion is denied.

## I.    PROCEDURAL HISTORY

In order to understand the lengthy history of Quinn's status on pretrial release and detention, the court begins by setting out the following chronological explanation.

### A.    Quinn's Initial Arrest and Release on Bond

This case arises from a methamphetamine drug trafficking operation.  On August 24, 2022, a grand jury returned a 19-count indictment charging six defendants with Conspiracy to Distribute and Possess With Intent to Distribute Methamphetamine, 14 counts of Distribution of Methamphetamine, 2 counts of Possession With Intent to Distribute Methamphetamine, and 2 counts of Use of a Firearm During a Drug Trafficking Crime.  The indictment charges Quinn in Count 1 with Conspiracy to Distribute and Possess With Intent to Distribute Methamphetamine (50 grams or more), in Count 13 with Possession with Intent to Distribute Methamphetamine (5 grams or more), and in Count 14 with Use of a Firearm During a Drug Trafficking Crime (a .40 caliber semi-automatic handgun).  He is facing 10 years to life imprisonment on Count 1, 5 to 40 years on Count 13, and an additional 5 years to life on Count 3 that will run consecutive to any other term of imprisonment.  As a result, Quinn's best-case scenario based on the current charges against him appears to be a statutory minimum of 15 years imprisonment.

Quinn was arrested on September 1, appeared for his initial appearance on September 2, and the matter was set for a detention hearing on September 7.  According to the Pretrial Services Report, Quinn and his wife had been living in Independence with their three children (ages 22, 20, and 15), their oldest daughter's boyfriend, and two grandchildren (ages 8 and 1), but they were in the process of moving out of that house and moving in with Quinn's mother, Theresa Burmahl, and her husband, Richard Burmahl.  Quinn did not have any recent employment history.  He said

he owned his own business, but admitted he had not had any income for several months and did

not otherwise indicate how he had been supporting himself financially.   He reported he used

cannabinoids "occasionally" and methamphetamines "weekly," but that he last used both "2 years

ago."  Quinn's wife and father confirmed that he had a history of substance abuse, but his mother

"indicated she was unaware of the defendant having any substance abuse history."  At the time of

the Pretrial Services Report, Quinn had charges pending against him in Jackson County for Passing

Bad Check and (2 cases) Tampering With a Motor Vehicle; a history of at least five failures to

appear (on 10/24/2019, 1/9/2020, 9/24/2020, 3/31/2022, and 5/12/2022); and a warrant for his

arrest by the Olathe Police Department for failing to appear on 6/9/2022.  The Pretrial Services

Report found that Quinn posed a risk of nonappearance and danger to others, and assessed him as

a PTRA Risk Category of 4, but nevertheless recommended that he be released on bond with

certain conditions.

Presumably based on this recommendation, the government withdrew its motion for

detention and the court released Quinn on bond.  (ECF 30, 31.)  Among other things, Quinn's

release conditions required him to submit to supervision by and report for supervision as directed

to Pretrial Services, to advise his supervising officer before making any change in residence or

telephone number, to not use or unlawfully possess narcotics or other controlled substances, and

to submit to testing for prohibited substances as required by Pretrial Services.  (ECF 31.)

B.      **Quinn's Initial Release on Bond**

When Quinn reported for his initial intake appointment with Pretrial Services on September

20, he tested positive for methamphetamine.    (ECF 54, 70.)    He initially denied using

methamphetamine and tried to explain away the positive drug test by saying "he had sex with his

wife who had been using methamphetamine." (ECF 70 & 107, at 10-13.)  After his supervising officer explained to him how ridiculous that concept was, he admitted he had used methamphetamine. (ECF 107, at 12-13.)  He also signed a consent to modify his release conditions to require him to participate in a program of inpatient or outpatient substance abuse therapy. (*Id.* & ECF 41.)  His supervising officer told him to "make sure you go through RADAC" and told him it needed to be a treatment facility that Pretrial Services could verify.  (ECF 107, at 27.)

Pretrial Services then tried to reach him several times by phone to arrange drug treatment, but was unable to reach him. (ECF 107, at 13.)  From approximately September until November, Pretrial Services was able to reach Quinn only a couple of times by text, and then he changed his cell phone number and Pretrial Services could not reach him on either his old cell phone number or his new one. (*Id.* at 14, 21-22.)  On November 21, Pretrial Services tried to conduct a home contact at Ms. Burmahl's home, where Quinn was supposed to be living.  Quinn's stepfather was there, and he said Quinn was no longer living there and was not welcome there. (ECF 54.)  Pretrial Services left a card and asked Quinn's stepfather to have Quinn contact his supervising officer. Quinn's stepfather said he would not hear from or talk to Quinn, but that he would give the card to Ms. Burmahl.  She relayed to Quinn that he needed to contact his supervising officer, but he still did not do so. (ECF 70; ECF 107, at 43-44.)

Quinn also did not follow his supervising officer's direction to go through RADAC to arrange substance abuse treatment.  Instead, on November 22, Quinn's attorney James Campbell called Quinn's supervising officer to tell her that Quinn had entered inpatient treatment at Cottonwood Falls in Olathe.  Pretrial Services could not find a Cottonwood Falls facility, but there is a Cottonwood Springs in Olathe. (*Id.* at 16.)  When Quinn's supervising officer reached out to

Cottonwood Springs, that facility reported that it did not have any record of Quinn being in treatment there.  (ECF 107, at 15.)

On November 26, Pretrial Services learned that Quinn had entered treatment in Valley Hope in Atchison two days earlier, on November 24.  (*Id.* at 16, 25.)  He lasted only 2 days.  On November 26, he abruptly left the facility when he became angry that he was woken up in the morning for doctor services.  (ECF 54, 70.)

On December 5, the court approved Pretrial Services' petition to revoke Quinn's bond and issued a warrant for his arrest.  (ECF 54.)  From the time Quinn left Valley Hope on November 26 until he was arrested on December 28, Pretrial Services did not know where he was or how to reach him.  (ECF 107, at 18.)

### C.      Quinn's January 4 Bond Revocation

On January 4, 2023, the court held a bond revocation hearing.  (ECF 70.)  In addition to Quinn's history on bond supervision as set forth above, the government presented Valley Hope's notes from Quinn's two-day stint at treatment there.  Those notes revealed that, "[o]n admission, Ronald seemed to be agitated, to be anxious, to be experiencing some withdrawal, and to be intoxicated." (Govt. Ex. 2.)  Furthermore, "[p]rior to admission, [he] had been using on a daily basis for about three years." (*Id.*)  Of course, this was contrary to Quinn's statement to Pretrial Services during his initial interview that he had last used controlled substances two years ago. Valley Hope reported that Quinn "made no progress pursuing his treatment goals" because he was "not in treatment long enough to complete a treatment plan." (*Id.*)  He was discharged with a "poor" prognosis; and he was "unable to make a commitment to follow through with his continuing care plans" and "needs to express being committed to treatment before readmitting." (*Id.*)

At the bond revocation hearing, Quinn presented the testimony of his mother, Ms. Burmahl. She testified that Quinn was living with her between September and December of 2022, that she knows Quinn and his wife use methamphetamine, that she can tell when he is using and when he is not, and that he was not using drugs while he was living with her during that time period. (ECF 107, at 32-36, 40-45.)  This testimony was contrary to all other evidence of record.  For example, when Pretrial Services attempted a home contact with Quinn at Ms. Burmahl's home (where he was supposed to be living), Quinn's stepfather said Quinn was not living there and was no longer welcome there.  Likewise, Quinn told Valley Hope that he "currently lives with himself, his children have a room and visit often."  (Govt. Ex. 2.)  Also, Ms. Burmahl's testimony to the effect that she knows Quinn and his wife use methamphetamine (but could tell that he was not using while he was living with her) was contrary to her earlier statement to Pretrial Services in September of 2022 that she was "unaware of the defendant having any substance abuse history."

The court revoked Quinn's bond based on its finding that all four prongs of 18 U.S.C. § 3148(b)(1) and (2) were met. (ECF 70.)  First, the court found probable cause that he committed a crime while on release as required by § 3148(b)(1)(A) by unlawfully possessing and using methamphetamine.  This gives rise to a rebuttable presumption that no condition or combination of conditions of release will reasonably assure that he will not pose a danger to the safety of others—a presumption he did not rebut for all of the reasons set forth above and therefore § 3148(b)(2)(A) is also met.  In sum, the record reflects that "the fact that he is on bond while facing a lengthy term of incarceration on federal drug and firearm charges was insufficient to deter him from continuing to use methamphetamine or to motivate him to carry out substance abuse treatment as required by Pretrial Services."  (ECF 70.)  The court also found clear and convincing

evidence that Quinn violated his release conditions as required by § 3148(b)(1)(B) for essentially

the reasons set forth above and also that "he has not been compliant with directives from Pretrial

Services and has not made himself amenable to supervision."  (ECF 70.)  Furthermore, the court

found that he is unlikely to abide by release conditions as required by § 3148(b)(2)(B) for the

following reasons:

> he is struggling with substance abuse problems and is not being
> honest with and responsive to Pretrial Services in trying to address
> noncompliance issues.   To the contrary, the record contains
> numerous inconsistencies that suggest he has tried to elude any
> effective level of supervision.

(ECF 70.)

### D.      Quinn's Attempts at Release to Inpatient Treatment

Less than three weeks later, Quinn filed his first motion for release to attend inpatient

treatment based on a fraudulent document he submitted to the court.  (ECF 77.)  Quinn's motion

reported that he received a letter from Valley Hope on January 18 that the facility had bed space

available for him for inpatient treatment.  He attached the letter as Exhibit A to his motion.  (ECF

77-1.)  The letter was titled "Valley Hope Treatment Admissions" and purported to lay out a

"treatment plan" for Quinn to first attend "30 day impatient [sic] treatment program under the care

of the assigned case manager to start there [sic] successful substance abuse program which includes

detox followed by there [sic] 12 step program with the mental evaluation"; then "to be placed in

our sober living facility and outpatient care for 60 days"; then "if required we can provide the

resources to place patient at sober living for up to 6 months through our network housing or patient

can enter our residence sober living facility located in Norton Kansas"; and, finally, the "duration

for this treatment plan is 9-12 months with lifetime resources available through the case manager."

(*Id.*)  The letter was signed by Quinn, but not by any representative of Valley Hope.  Exhibit B

was a fax with indicia suggesting it actually came from Valley Hope, but it contained nothing more than a generic statement about an available bed and the admissions process without anything specific to Quinn.  (ECF 77-2.)  The final attachment, Exhibit C, was a letter from Quinn himself in which he asked the court to allow him a "second chance at pre-trial release."  (ECF 77-3.)  Among other reasons, Quinn's letter proclaimed that "I am a natural born competitor.  I have played professional baseball, been a member of the Professional Bowler's Tour and have raced cars professionally."  (*Id.*)

Given the highly unusual nature of the lengthy treatment plan set out in Exhibit A (the likes of which this court had never seen before), the court set this motion for a hearing on February 7. Meanwhile, Quinn's supervising officer contacted Valley Hope to ask about a bed date for him. Valley Hope's Admissions Manager stated that Valley Hope did not provide Exhibit A and did not provide any "specific admissions plan" as stated in Paragraph 7 of the motion.  To the contrary, she said that Quinn had reached out to Valley Hope to ask the facility to provide a letter, and Valley Hope specifically told Quinn that they would NOT provide a letter with a specific bed date or services.  Despite being told "no," Quinn somehow put together Exhibit A and submitted it to the court knowing full well that Valley Hope had refused to provide that exact information.  Valley Hope also provided a letter that contradicted nearly everything said in Exhibit A.  Valley Hope explained that patients are assigned a case manager while in residential treatment, but that case management roles end upon discharge.  As such, it is patients' responsibility to follow through with after-care plans, patients are not monitored or supervised, and they would not check in with a case manager weekly.  Also, Valley Hope does not complete mental health evaluations on every

patient and does not have a "residence sober living facility" or provide outpatient treatment services.

At the hearing on February 7, Campbell moved to withdraw as Quinn's counsel. (ECF 81.) It was apparent to the court that this was because of Quinn's lack of truthfulness with Campbell in trying to perpetuate fraud on the court. The court provisionally granted the motion pending appointment of substitute counsel, continued the hearing to February 17, and subsequently appointed the Federal Public Defender's Office to represent Quinn. (ECF 82, 83.)

At the hearing on February 17, Quinn moved to withdraw the Motion for Release Pending Trial. (ECF 87.) The court granted that motion, allowed Quinn to file a renewed motion with a release plan, and set the anticipated motion for a hearing on February 27. (ECF 88.)

Quinn then filed another Motion for Release Pending Trial in which he asked to be released to Valley Hope in Atchison. (ECF 89.) The court denied the motion because it was premature and hypothetical because it did not provide a firm bed date for the facility, and the court advised the parties that it would not consider the motion unless and until Quinn could present a concrete and imminent plan for inpatient treatment confirmed by Pretrial Services. (ECF 94.)

Quinn then filed a third Motion for Release Pending Trial "now that his medical insurance is active," in which he asked to be released to attend inpatient treatment at DeNovo Recovery in St. Joseph with an available bed date of March 29, 2023. (ECF 102.) The motion also pointed out that Heartland RADAC conducted a substance abuse evaluation of Quinn on March 3, and recommended that he receive inpatient treatment. (*Id.*) By the time the court conducted a hearing on that motion on March 27, Quinn's first choice for treatment was still DeNovo Recovery in St. Joseph, but he had also lined up an alternative plan for inpatient treatment at Mirror in Wichita.

The court granted him release to attend treatment at Mirror rather than DeNovo Recovery in St. Joseph because the court did not want to transfer his supervision to another district (*e.g.*, the Western District of Missouri) given his history of trying to elude supervision, which this District's Pretrial Services office was familiar with navigating by then.  The court further ordered Quinn to appear before the court approximately one week before his anticipated release from inpatient treatment to present his proposed next-stage release plan.  (ECF 109.)  Quinn successfully completed inpatient treatment on April 20.

### E.     Quinn's Ongoing Violation Conduct

The court modified Quinn's release conditions to approve his next-stage release plan to live at Oxford House Peyton in Olathe while he attended intensive outpatient treatment at Valley Hope in Overland Park.  (ECF 111.)  The order specifically stated that "[h]e is not authorized to make any changes to his living arrangements or substance abuse treatment program without first obtaining prior court approval."  (*Id.*)  Upon his release, his supervising officer visited him at the Oxford House and reminded him of the location monitoring requirements and the court-ordered requirement that he reside at Oxford House Peyton and nowhere else.

This arrangement did not last long.  Just 10 days later, Quinn was kicked out of Oxford House Peyton on April 30 after he had an unapproved female guest at the house and missed the Sunday mandatory house meeting.  (ECF 112.)  Quinn's supervising officer told him to go to a hotel and start looking at other Oxford House openings while Pretrial Services initiated the process of notifying the court.  Quinn checked into the Stay Bridge Hotel in Olathe, and his supervising officer told him to stay there until she heard back from the court.  (ECF 112.)  On May 1, his supervising officer conducted a residential contact at the Stay Bridge Hotel and asked him about

his progress with Oxford House openings.  He said he had an interview scheduled at Bluevue

Oxford House in Olathe the next day, on May 2.  Pretrial Services later learned that Quinn was a

no-call, no-show for his interview at Blueford Oxford House on May 2.  (*Id.*)  Instead, on May 2,

Pretrial Services received a location monitoring alert that Quinn was moving again.  When Pretrial

Services contacted Quinn about this, he reported that he was being moved to a different room at

the Stay Bridge Suites.  Once again, his supervising officer told him not to move his beacon or

location without further approval.  About two hours later, his location monitoring equipment

showed he was in Grain Valley, Missouri.  When Pretrial Services questioned Quinn about this,

he said he moved to the Comfort Inn in Grain Valley.  Pretrial Services reminded him that he did

not have prior authorization to move, and once again instructed him to stay at his current location.

(*Id.*)  On May 3, he unplugged his beacon and moved without prior approval even though Pretrial

Services told him he was not allowed to do this.  Pretrial Services later found out that he had moved

to an address in Buckner, Missouri.  (*Id.*)

At this point, the court issued a warrant for Quinn's arrest on May 5 and revoked his bond

on May 8.  (ECF 112-116.)  In doing so, the court found clear and convincing evidence that he

violated his bond conditions by getting kicked out of Oxford House Peyton and therefore violated

the condition requiring him to reside there and not make any changes in his living arrangements

without first obtaining court approval, and also by violating the condition requiring him to submit

to location monitoring as directed by pretrial services and to comply with the location monitoring

program requirements.  (ECF 116.)  Furthermore, the court found that Quinn is unlikely to abide

by conditions of release for largely the reasons stated in the court's prior order revoking his bond.

(ECF 70.)  The court explained that, given Quinn's history on pretrial release,

> the court was willing to release him only to an environment that would provide sufficient structure—namely to attend inpatient treatment and, once he completed that, to reside at an Oxford House. But as soon as he got kicked out of the Oxford House, he once again returned to the same type of gamesmanship and obfuscation with his supervising officer, thus confirming that he really does need to be in a highly structured environment in order to be amenable to supervision.

(ECF 116.)

In the current motion, Quinn now once again seeks release to live at the Oxford House Peyton in Olathe.  He explains that the house members previously voted him out of the Oxford House (4 in favor, 3 opposed) after he missed a mandatory group meeting.  But, now, the current house members have voted to allow him to return.  (ECF 120, 120-1.)  The Government opposes release.  So does Pretrial Services.  (*See* Exhibit A.)

## II.    LEGAL STANDARD

Given the procedural posture and the substance of the relief sought, the court construes Quinn's motion as a motion to reopen detention pursuant to 18 U.S.C. § 3142(f)(2).  Under that statute, the court may reopen detention

> at any time before trial if the judicial officer finds that [1] information exists that was not known to the movant at the time of the hearing and [2] that has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person in the community.

§ 3142(f)(2).

Here, the only new information Quinn has identified that was not known to him at the time of the bond revocation hearing on May 8 is that the current house members at Oxford House Peyton voted to allow him to return to the house and he now has a bed available there.  But this information does not have a material bearing on any of the factors the court considered in revoking his bond

under § 3148(b).  The court already released Quinn multiple times on bond supervision, and he was unsuccessful at anything short of an inpatient setting.  Just days after he was released to reside at Oxford House Peyton, he promptly began disregarding his bond conditions and doing whatever he wanted—violating house rules, getting kicked out, and disregarding his supervising officer's instructions.  This conduct is more of this same after he was initially released on bond in September of 2022.  He does whatever he wants whenever he wants.  He lies about whatever he wants whenever it suits him.  He ignores his supervising officer's directives.  In short, the record is replete with indicia that Quinn is incapable, unwilling, or both, to comply with his release conditions.

Quinn's argument to the contrary is essentially twofold.  For one, he argues the members of Oxford House Peyton have voted to allow him to return and he characterizes the loss of that release plan as "critical to the Court's decision to revoke detention."  (ECF 123, at 2.)  This argument oversimplifies the reasons the court last revoked Quinn's bond.  Although Quinn could no longer comply with the condition requiring him to reside at the Oxford House once he got kicked out, the reason he was kicked out was because he could not even comply with the house's rules that he not have overnight guests and that he attend mandatory house meetings.  These are fairly simple requirements that he apparently could not be bothered to comply with even though he knew he was under a court order to live at Oxford House Peyton.  And the reason the court imposed this strict requirement is borne out by his subsequent conduct, where he spent days moving around, monkeying with his location monitoring equipment, and ignoring his supervising officer's instructions.  It is more of the same—he does whatever he wants, says whatever he wants, and ignores his supervising officer.  He is not amenable to supervision.

Second, Quinn argues the court "must" release the defendant under § 3142(g) unless the court finds that Quinn is a danger to the community or a risk of nonappearance. But this argument misconstrues the procedural posture of Quinn's detention. He is not currently detained by virtue of a detention order following a detention hearing. He was released on bond and has now been detained (twice) pursuant to § 3148. That statute applies to someone like Quinn—"[a] person who has been released under section 3142 of this title, and who has violated a condition of his release." § 3148(a). It provides that the court "**shall enter** an order of revocation and detention if, after a hearing, the judicial officer" makes the findings set forth in subsections § 3148(b)(1) and (2). (Emphasis added.) Here, the court made those findings twice. (ECF 70, 116.) Quinn's motion is therefore denied for essentially the reasons borne out by the lengthy record in this case concerning his detention, as summarized by the court's prior orders revoking his bond (ECF 70, 116), as further articulated by Pretrial Services (Ex. A), and as explained in the Government's response (ECF 122). In short, Quinn has not presented any new information that persuades the court that it would have a material bearing on Quinn behavior. The only thing that is clear to the court is that he is willing to say anything and do anything to secure release, after which he will promptly do whatever he wants to do regardless of his release conditions.

**IT IS THEREFORE ORDERED** that Quinn's Motion for Release Pending Trial (ECF 120) is denied.

**IT IS SO ORDERED**.

Dated this 12th day of June, 2023.

s/Angel D. Mitchell
Angel D. Mitchell
United States Magistrate Judge